Daniel L. Steele (6336)
SUMSION STEELE & CRANDALL
765 N. Main St.
Spanish Fork, UT 84660
Telephone: (801) 426-6888
Email: dan@sumsionsteele.com

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
## CENTRAL DIVISION

| | |
|---|---|
| I.C. SECURITY PRINTERS, INC.-MARKETING, a Utah Corporation,<br><br>Plaintiff,<br><br>v.<br><br>TOMOCREDIT, INC., a Delaware Corporation,<br><br>Defendant. | **COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br><br>Case No.: _____<br><br>Judge: _____ |

Plaintiff I.C. Security Printers, Inc.- Marketing ("IC") complains and alleges the following facts, causes of action and remedies against the above-named Defendant as follows:

### PARTIES, VENUE & JURISDICTION

1.      Plaintiff I.C. Security Printers, Inc.- Marketing ("IC") is a Utah corporation with its principal place of business in Salt Lake County, Utah.

2.      Defendant TomoCredit Inc. ("TomoCredit") is a Delaware corporation with its principal place of business in San Francisco, California that continuously and systematically transacts business in all 50 states, including Utah.

3.      The Court has jurisdiction over this civil action pursuant to Title 28, UNITED STATES CODE, § 1332 because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and every issue of law and fact in this action is wholly between citizens of different States.

4.      Venue is appropriate in this Court pursuant to Title 28, UNITED STATES CODE, § 1391(b)(1) and (c)(2) because the Court has personal jurisdiction over TomoCredit, which is an entity with the capacity to sue and be sued in its common name under applicable law and, as a defendant, is deemed to reside, for venue purposes, in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question.

## **GENERAL ALLEGATIONS COMMON TO ALL CLAIMS**

5.      IC is a Utah corporation that provides, among other things, credit card generation and distribution services to credit card issuers.  Specifically, IC provides services to Financial technology and Financial Institutions consisting of the creation, personalization, and fulfillment of the credit card and the shipping of the credit card to the end users accompanied by literature and packaging.

6.      TomoCredit is a Delaware corporation headquartered in San Francisco that issues credit card accounts to persons without requiring a credit score.

7.      In or about April 2021, TomoCredit approached IC about its credit card distribution services.

8.      On April 14, 2021, IC emailed TomoCredit a proposal outlining the cost for the various services IC offers.

9.      Following the April 14, 2021 email, IC received little to no communication from TomoCredit.

10.     In or about October 2021, TomoCredit contacted IC about obtaining an updated proposal, stating that TomoCredit was "hoping to kickoff the project ASAP."

11.     On November 1, 2021, IC emailed an updated proposal to TomoCredit.

12.     IC and TomoCredit engaged in negotiations regarding pricing and, on November 10, 2021, IC emailed TomoCredit updated pricing for its services.

13.     On November 11, 2021, Ronnie Mou, TomoCredit's Vice President of Finance and Operations and CFO, emailed IC, stating "I have discussed with my team and we would like to move forward. What's our next step? When can we start the 12 weeks implementation?"

14.     On November 12, 2021, IC emailed TomoCredit a copy of its Master Services Agreement ("MSA") for review and signature.

15.     IC's MSA sets forth IC's general terms and conditions but does not include information regarding pricing or other details specific to individual orders for products and services requested by and provided to IC's customers.

16.     Not all IC's customers require or desire to sign the MSA and, although IC prefers to have its customers sign the MSA, IC does not require it from its customers and will still provide goods and services to customers who do not sign the MSA, as pricing details are provided in the form of formal proposals and through communication with a customer prior to the customer submitting an order, and the services are billed at the quoted and approved costs after the order has been fulfilled.

17.     TomoCredit did not sign and return the MSA.

3

18.     After securing TomoCredit's go-ahead, IC began the process of designing and manufacturing of cards for TomoCredit for future personalization and fulfillment.

19.     IC physically provided the envelopes, bi-fold carriers, and custom card carriers for TomoCredit's orders and, through a subcontractor, provided the actual credit card and personalization. IC also provided design and consultation services and managed the fulfillment of TomoCredit's orders including shipping of the cards to TomoCredit's customers.

20.     Because IC does not directly access any secure data or physically produce the credit cards, it uses third-party vendors, who are specifically set up to be able to securely handle credit card data and print and ship the cards.

21.     For TomoCredit, IC chose Perfect Plastic Printers ("Perfect Plastic") as the provider for card manufacturing, personalization, and fulfillment for TomoCredit.

22.     All card printing vendors utilized by IC, including Perfect Plastic, set their own manual fulfillment fees, handling fees, and shipping options and prices which are charged to IC. IC bills TomoCredit for all of these services.  Put in other terms, TomoCredit does not pay Perfect Plastic for the work and services Perfect Plastic provides.  Instead, Perfect Plastic bills IC and IC pays Perfect Plastic for the services provided on behalf of TomoCredit.  IC then bills TomoCredit.

23.     To ensure data integrity and security, it is essential that IC's clients securely transmit all data directly to IC's card printing vendors.

24.     As part of the initial account setup, a file was created to transmit secure data via Secure File Transfer Protocol (SFTP) from TomoCredit to Perfect Plastic.

25.    To issue a credit card, TomoCredit enters the necessary data into its processing software from Galileo Financial Technologies ("Galileo"), who is TomoCredit's designated issuer processor.

26.    Typically, early on every business day, Galileo directly transmits the data input by TomoCredit the prior day in a secure batch file to Perfect Plastic for card personalization (printing cardholder information onto the card) and fulfillment. This data file is referred to as an emboss file.

27.    Each day's emboss file includes new and replacement credit card requests entered by TomoCredit into Galileo.

28.    Beginning in March 2022, TomoCredit requested, and IC provided credit card printing distribution services to TomoCredit.

29.    Between March and October 2022, IC issued and TomoCredit paid 11 invoices, totaling $581,042.42 for products and services provided by IC to TomoCredit for the production and issuance of credit cards. These cards were shipped via USPS and FedEx.

30.    Later, at TomoCredit's request, IC set up TomoCredit's cards to ship in a standard 8.5 x 11 inch bi-fold carrier with partially automated processing via FedEx 2-day shipping.

31.    8.5 x 11 inch bi-fold carriers are widely used in the industry and are cost effective because they can be processed entirely by equipment that personalizes the credit cards with the cardholder information, automatically affixes the card to the carrier and, if USPS shipping is used, automatically inserts the carrier into a 6 x 9-inch envelope and places the envelopes in a sorting process for mailing.

32.    Cards shipped via FedEx cannot be processed in a fully automated environment at Perfect Plastic. Once the card is personalized and affixed to the 8.5 x 11-inch carrier, it must be manually pulled from the machine and manually placed into a FedEx envelope, then a shipping label must be manually created and affixed to the envelope.

33.    Because the process of shipping via FedEx 2-Day interrupted the otherwise fully automated process for cards sent via USPS, costs per card increased significantly due to the manual labor associated with the FedEx process, which are charged as manual fulfillment charges and package preparation fees.

34.    Additionally, if a card issuer chooses a card carrier other than the standard 8.5 x 11 inch bi-fold card carrier, the manual fulfillment costs increase further because cards must be manually affixed to the custom carrier, regardless of which shipping company is used.

35.    Sometime around April 2022, TomoCredit decided to use a custom bifold card carrier that was the approximate size of a postcard.

36.    IC began working together with TomoCredit and TomoCredit's graphic designer, Derek Poon to design and produce a custom card carrier.

37.    In April 2022, TomoCredit's emboss files contained instructions that directed Perfect Plastic to ship the majority of that months' orders via USPS First Class Mail.

38.    On April 6, 2022, John Umber, Product Manager for TomoCredit, emailed IC requesting pricing on express shipping.

39.    Later, on April 6, 2022, Ms. Mou emailed IC stating, "we also need the express shipping code to pass to Galileo for embossing."

40.    On April 7, 2022, IC emailed Ms. Mou and others on TomoCredit's team the costs for expedited shipping, which included rates for USPS First Class, FedEx Ground, and FedEx 2-day shipping, and package preparation fees that applied to FedEx shipments. The email noted the extra costs related to using FedEx 2-day shipping.

41.    On April 13, 2022, Mr. Umber emailed IC asking how TomoCredit's account was currently set up for mailing out cards. Ms. Mou was cc'd on this email.

42.    Later, on April 13, 2022, Ms. Mou emailed IC stating "does USPS First Class has [sic] the shipping tracking number? What's the delivery time frame for each option?"

43.    On April 14, 2022, IC replied to Mr. Umber, Ms. Mou and others on TomoCredit's team, informing them that the emboss files that TomoCredit sent directly to Perfect Plastic, had been coded to have TomoCredit's cards ship via USPS First Class Mail, and explained that the method of shipping that Perfect Plastic uses is determined based upon what shipping method code TomoCredit enters into the emboss file it generates and sends to Perfect Plastic. Also in this email, in response to Ms. Mou's questions, IC explained that USPS First class does not include tracking services and provided the delivery time frame for each shipping option.

44.    That same day, Ms. Mou replied to IC noting another card printer they were utilizing charged $7 for USPS Priority, which provides faster transit time and package tracking services compared to USPS First Class, and that TomoCredit would like to do the same with Perfect Plastic.

45.    Also on April 14, 2022, IC emailed Ms. Mou and her team explaining what needed to be done for TomoCredit to transmit the proper shipping codes in its emboss file to Perfect Plastic.

46.    On April 15, 2022, Ms. Mou emailed IC stating "any update on the USPS Priority shipping option at Perfect Plastic? Also, if we do the manual fulfillment (customized carrier), do we still need to pay the extra Package Preparation Fee . . .?"

47.    On April 18, 2022, IC emailed Ms. Mou, indicating IC was unable to utilize USPS Priority shipping, because none of its vendors offered that shipping method. IC detailed the costs for FedEx 2-day, which included the associated manual fulfillment charges, package preparation fees, and shipping fees.

48.    Thereafter, on April 18, 2022, Ms. Mou emailed IC stating "Hi Joe – Fed Ex 2-day works for us. Can you please help Jon to set up the value for the emboss file?" and indicating she would like "to discuss the options to waive/reduce the manual fullfillment/package [sic] preparation" fees.

49.    Also on April 18, 2022, IC emailed Ms. Mou to clarify when TomoCredit intended to switch to using FedEx 2-day shipping and explain, again, the procedure for TomoCredit to change the shipping code in its emboss file necessary for TomoCredit to obtain FedEx 2-day service from Perfect Plastic. IC further indicated that the only way to keep the cost of manual fulfillment down would be "to use a very easy to insert carrier with limited pieces and components."

50.    Thereafter, on April 18, 2022, Mr. Umber, TomoCredit's Product Manager, emailed IC stating "I would suggest we stick with one of the three options so that is currently in

8

place at [Perfect Plastic]. . . Again, I think Fedex 2 day would be the best as it closely mirrors our current experience." Ms. Mou was cc'd on this email.

51.    On April 19, 2022, IC replied to Mr. Umber, stating "I would recommend the same thing – and stick to one of the options already set up. You guys are in control of the shipping method – so as soon as you want to switch it over to value '6' Fed Ex 2-day just do that with Galileo and all cards will start shipping out that way." Ms. Mou was cc'd on this email.

52.    Also on April 19, 2022, after IC had provided TomoCredit with examples of custom card carriers TomoCredit could use, Mr. Umber emailed IC, "My guys really liked the black bifold that had the magnet (we wont [sic] use the magnet, but like the fold) and the Zolve fold. Can we get pricing on those? I've handed them off to my design guy to work on them." Ms. Mou was cc'd on this email.

53.    On May 10, 2022, IC emailed TomoCredit proofs for the various card carriers and overnighted printed proofs to TomoCredit, which were printed on regular paper and were meant to give TomoCredit an idea of how the full press proof of the carrier would appear.

54.    On May 10, 2022, Mr. Umber responded to IC, "looks good, please proceed" and later that day emailed IC that the order would be for 50,000 card carriers.

55.    That same day, IC emailed proofs which included die line files for the Spot UV areas and embossing that TomoCredit had requested and provided a per-carrier price quote for an order of 50,000 card carriers.

56.    On May 12, 2022, Mr. Umber emailed IC that TomoCredit had received the sample card carrier, requesting a sample printed on the actual cardstock to be used, to which IC responded that it would take between 5 to 6 weeks to do a press proof and cost "a couple

thousand dollars" and asking if TomoCredit wanted a quote for the cost of obtaining a press

proof. TomoCredit did not request a quote and no press proof was ordered.

57.    On May 13, 2022, Mr. Poon, TomoCredit's graphic designer emailed IC

indicating he wanted to make a change to the design and asked if IC wanted him to revise and

resend the artwork, to which IC replied that it would prefer Mr. Poon revise the artwork and send

it to IC.

58.    On May 17, 2022, Mr. Umber emailed IC requesting pricing for order amounts

less than 50,000 carriers.

59.    On May 23, 2022, Mr. Umber emailed IC, stating "Adding Ronnie [Ms. Mou] to

the email chain. Any updates on pricing?"

60.    Thereafter, on May 23, 2022, IC emailed Mr. Umber and Ms. Mou with pricing

for various quantities of card carriers. Ms. Mou responded asking how long the carriers would

take to produce to which IC replied around 5 to 6 weeks for production plus transit time from

Salt Lake City to Chicago.

61.    Later, on May 23, 2022, Ms. Mou emailed IC, stating "We prefer to order 15,000

. . . for the first batch just to make sure the quality is as expected" and asking if there were any

additional charges, to which IC responded that, other than taxes and shipping, there would be no

additional charges to manufacture the carriers and asked if IC should move forward with the

order of 15,000 carriers.

62.    Thereafter on May 23, 2022, Mr. Poon emailed IC requesting it wait for revised

artwork that he would send to IC before moving forward with production, to which IC replied

that IC would then provide updated proofs with the new artwork for approval. Ms. Mou was cc'd on this email. That same day, Ms. Mou emailed IC, "15,000 confirmed. Thanks Joe!"

63.    On May 25, 2022, IC emailed Ms. Mou and Mr. Umber following up on questions TomoCredit had regarding package and fulfillment fees. In that email, IC outlined the costs associated with TomoCredit's decision to use manual fulfillment with their new card carriers, including setup fees, manual fulfillment fees, package preparation fees, and shipping fees.

64.    On July 22, 2022, IC emailed Ms. Mou and Mr. Umber, stating "The new Tomo card carriers will be shipping out Monday of next week to Perfect Plastic. I wanted to follow up on this email I sent back in May and see which shipping method you would be using for these new carriers. I assume you want these to be directly inserted into a FedEx envelope and ship via FedEx 2 day? Please confirm. Are we also OK to move forward on the pricing I sent in my previous email for switching over to manual fulfillment with these carriers?"

65.    That same day, Mr. Umber replied, cc'ing Ms. Mou, "Yes, we will continue with Fedex 2 day" to which IC responded, also cc'ing Ms. Mou:

> "Sounds great. We will move forward with the implementation with [Perfect Plastic] to move to manual fulfillment to have these carriers go directly into the FedEx envelope and then ship FedEx 2-day. Perfect did say they need some time to make this switch. The carriers will be delivering around Thursday of next week and they will then begin their process. We will keep you updated on how this progresses. I assume you are all good on the pricing I shared with you with this change to manual fulfillment? If you have any questions please let me know."

66.    On July 28, IC emailed Mr. Umber stating "Do you want to offer 2 card packaging options? 1 manual fulfillment and the other automated one on bifold carriers that we are using currently? Or are you just wanting to move everything over to manual fulfillment and have 1 option?" Ms. Mou was cc'd on this email.

67.     On August 1, 2022, Mr. Umber responded stating "I would like to move everything over to the manual fulfilment. I'll be tracking activation rates on my end to confirm if the new card carrier results in better activation rates. Will you let me know when they change over?" to which IC responded that IC would transition everything over to manual fulfillment using the new card carrier. Ms. Mou was cc'd on these emails.

68.     In a text message exchange between August 1 through 9, 2022, IC and TomoCredit discussed switching its card carrier. Ms. Mou was included in these text messages. Mr. Umber indicated TomoCredit "would like to move everything over to manual fulfillment. I'll be tracking activation rates on my end to confirm if the new card carrier results in better activation rates. Will you let me know when they change over?" IC confirmed it would transition everything over to manual fulfillment using the new card carrier. TomoCredit decided to do a test order for the new manual fulfillment packaging and carrier.

69.     Beginning around mid-August 2022, TomoCredit switched to manual fulfillment in order to begin using TomoCredit's new, custom carriers. This greatly increased the processing charges to TomoCredit, as IC had indicated it would.

70.     In an email chain from September 9 through 20, 2022, TomoCredit inquired with IC about methods to reduce the manual fulfillment and handling fees if TomoCredit switched back to automatic fulfillment using a different card carrier. IC informed TomoCredit that if TomoCredit chose to switch to using standard card carriers that allow for automatic affixing of the card to the card carrier, the fees would decrease but there would still be package preparation fees using FedEx due to the manual labor involved.

71.     In this email chain, on September 20, 2022, TomoCredit detailed the fees associated with using custom card carriers versus fees associated with using automatic fulfillment, requesting that IC confirm their calculations.

72.     IC responded that TomoCredit's calculations were correct.

73.     In or around September 2022, TomoCredit decided to try using a different card carrier, upon information and belief, in order to lower its fulfillment and handling charges.

74.     TomoCredit continued to utilize manual fulfillment to ship its cards until mid-October 2022, after which Ms. Mou and Chief Executive Officer, Kristy Kim decided to utilize USPS First Class Package 3-day services. Perfect Plastic agreed to make changes on its end to accommodate USPS First Class Package 3-day service. Because Perfect Plastic could not get set up for USPS First Class Package 3-day service until January, 2023, Ms. Mou chose to utilize USPS First Class with package tracking until January 2023 and instructed IC to have Perfect Plastic hard-code TomoCredit's emboss file to utilize USPS First Class until Perfect Plastic was able to utilize USPS First Class Package 3-day service.

75.     TomoCredit continued to select FedEx 2-Day for shipping until around mid-November, when it switched to USPS First Class Mail.

76.      During the time TomoCredit was utilizing manual fulfillment to send cards in its custom carrier and after IC transitioned TomoCredit back to fully automatic fulfillment using standard 8.5 x 11 inch bi-fold carriers, IC issued the following invoices to TomoCredit:

- Invoice 342854, dated September 1, 2022, for $97,742.56, a significant portion of which consisted of manual fulfillment, handling, and freight charges;
- Invoice 343264, dated October 1, 2022, for $310,350.90, a significant portion of consisted of manual fulfillment, handling, and freight charges;

- Invoice 343590, dated October 31, 2022, for $196,004.99, a significant portion of which consisted of manual fulfillment, handling, and freight charges;
- Invoice 343824, dated November 30, 2022, for $98,356.02, a significant portion of which consisted of manual fulfillment, handling, and freight charges;
- Invoice 343950, dated November 30, 2022, for $868.00 for charges related to card proof updates and cancellation and did not include charges for the production and fulfillment of any credit cards;
- Invoice 344266, dated January 2, 2023, for $15,207.99, a significant portion of which consisted of manual fulfillment, handling, and freight charges.

77.    TomoCredit has failed and refused to pay these invoices, which total $718,530.46 and contain primarily charges for the personalization and fulfillment of tens of thousands of credit cards to TomoCredit's customers Moreover, IC's November 30, 2022 and January 2, 2023 invoices contain greatly reduced shipping, handling, and fulfillment charges because TomoCredit switched to USPS shipping, yet TomoCredit refuses to pay those invoices.

78.    These unpaid invoices include manual fulfillment charges. These invoices also include freight and handling costs which are pass-through costs for IC, meaning that IC does not mark up the cost of shipping charged by FedEx or other common carrier, and merely charged TomoCredit the shipping and handling costs billed to IC by Perfect Plastic.

79.    The unpaid invoices include freight and fulfillment costs, which were incurred as a result of TomoCredit specifically requesting FedEx 2-day shipping and manual fulfillment costs associated with TomoCredit's decision to utilize a custom, post-card sized carrier in its emboss files sent directly to Perfect Plastic.

80.    On every invoice sent by IC to TomoCredit, the following is prominently displayed at the bottom of the invoice:

*TERMS: NET 30 UNLESS OTHERWISE NOTED*

14

A finance charge will be charged on all past due accounts. The finance charge is a periodic rate of 1.75% per month which is an annual percentage rate of 21%. Customer agrees to pay all collection costs and a reasonable attorney's fee until balance is paid in full. IC Group's FSC COC Number: SCS-COC-001216

Reusable prepress materials are included in the purchase. Title passes to customer upon payment of this invoice.

81.    Under IC's contract with Perfect Plastic, all costs for its services are billed to and paid by IC, which then bills its customer for those amounts.

82.    In or around November 2022 TomoCredit indicated to IC that it would not pay the outstanding invoices because the costs were too high, and IC responded by attempting to resolve the matter in good faith by negotiating with TomoCredit regarding potential discounts or reductions on the total amount due on the unpaid invoices.

83.    The Parties attempted to resolve the past due balance.  On December 5, 2022, TomoCredit took the position that the freight and manual fulfillment charges, which were authorized in writing by TomoCredit's CFO, were not owed because TomoCredit had never signed the MSA.

84.    TomoCredit further took the position that TomoCredit's CFO was not internally authorized to approve FedEx 2-day shipping and manual fulfillment and that, no order or transaction could be authorized without the Chief Executive Officer, Kristy Kim's or General Counsel and Chief Compliance Officer Douglas Greenberg's signature.

85.    Prior to December 5, 2022, TomoCredit never indicated that its internal policies required the CEO or General Counsel's signature.

86.    Also, on December 5, 2022, TomoCredit offered to continue doing business with IC, if IC would do TomoCredit the "business favor" of waiving all charges on the October 1,

2022 and October 31, 2022 invoices, which totaled $506,355.89 and included $270,200.54 in shipping, handling, and manual fulfillment charges. Shipping and handling charges are pass-through charges which are charged by third parties, paid by IC, and then charged to TomoCredit without any markup.

87.     On December 7, 2022 counsel for IC emailed a demand letter to Ms. Mou and Ms. Kim demanding payment of all past due amounts and providing for the amounts to be paid over three payments on or before December 9, 2022, December 16, 2022, and January 6, 2023.

88.     As of the filing date of this Complaint, TomoCredit has not paid any portion of the $718,530.46 due and owing to IC.

## FIRST CAUSE OF ACTION
(Breach of Contract)

89.     Each and every allegation of this Complaint that is not inconsistent with this First Cause of Action is hereby incorporated herein as though fully alleged as part of this First Cause of Action.

90.     TomoCredit sought out IC and requested IC provide specific products and services in exchange for payment of the costs thereof.

91.     IC provided the exact products and services expressly authorized by TomoCredit's CFO and expressly ordered by TomoCredit by requesting those services in the emboss files it created and sent directly to Perfect Plastic.

92.     IC invoiced TomoCredit for the products and services rendered.

93.     Under both common law principles and the Uniform Commercial Code, the parties' agreement constitutes a valid, binding contract.

94.     IC performed its duties under the contract by providing the exact goods and services requested by TomoCredit.

95.     TomoCredit breached the parties' contract by failing and refusing to pay the outstanding invoices.

96.     As a result of TomoCredit's breach, IC has suffered damages in the amount of $718,530.46 plus accrued and accruing interest, attorneys' fees, and costs.

## SECOND CAUSE OF ACTION
(Unjust Enrichment)

97.     Each and every allegation of this Complaint that is not inconsistent with this Second Cause of Action is hereby incorporated herein as though fully alleged as part of this Second Cause of Action.

98.     IC asserts this cause of action in the alternative in the event this Court determines that a contractual relationship did not exist between the parties.

99.     IC conferred a benefit upon TomoCredit in the form of the creation and fulfillment of credit cards for TomoCredit's customers.

100.    TomoCredit had an appreciation and knowledge that IC was conferring this benefit upon TomoCredit. Indeed, the expedited shipping aided in getting cards into their clients' hands faster, logically resulting in faster activation rates, and earlier interchange benefits for TomoCredit. Moreover, the use of the credit cards provided through IC generated revenue for TomoCredit in the form of transaction fees and interest on credit card balances.

101.    The retention of TomoCredit's benefit of IC group having created and fulfilled 42,244 credit cards to TomoCredit's customers without paying for their production and fulfillment make it inequitable for TomoCredit to retain this benefit without payment of its value.

17

102.     As a result of TomoCredit's failure to pay IC's invoices, IC has suffered damages

in the amount of $718,530.46 plus accrued and accruing statutory interest, attorneys' fees, and

costs.

**THIRD CAUSE OF ACTION**
(Breach of the Duty of Good Faith and Fair Dealing)

103.     Each and every allegation of this Complaint that is not inconsistent with this

Third Cause of Action is hereby incorporated herein as though fully alleged as part of this Third

Cause of Action

104.     In Utah, a covenant of good faith and fair dealing inheres in most, if not all,

contractual relationships.

105.     Under this covenant, each party impliedly promises that he will not intentionally

or purposely do anything which will destroy or injure the other party's right to receive the fruits

of the contract.

106.     TomoCredit had a duty to perform in good faith the obligations arising from and

created under the contract and refrain from actions that will intentionally destroy or injure IC's

right to receive the fruits of the contract.

107.     TomoCredit willfully and intentionally breached this covenant by clearly and

unequivocally requesting and authorizing IC to provide goods and services on its behalf, with a

full understanding of the costs and, after the goods and services were provided, knowingly

refusing to pay for the goods and services it requested and demanding that IC waive over

$500,000.00 in charges that TomoCredit knew of, requested, and authorized, before TomoCredit

would pay any portion of the outstanding balance of $718,530.46, under the tenuous theory that TomoCredit did not have to pay any charges because it never signed the MSA.

108.    In so doing, TomoCredit breached its obligation to perform the contract in good faith and taking actions inconsistent with the agreed common purpose and IC's justified expectations.

109.    TomoCredit's breaches, failures, and /or omissions constitute bad faith and that they were willful, unlawful, arbitrary, and capricious, entitling IC to damages, attorneys' fees, costs, and penalties as allowed by law.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff prays for relief against Defendant as follows:

A.    Pursuant to Plaintiff's First Cause of Action for Breach of Contract:

  i.    Damages, in an amount to be determined at trial, but exceeding $718,530.46, exclusive of interest, attorneys' fees and costs;

  ii.    Interest as set forth in IC's invoices, which continues to accrue;

  iii.    Attorneys' fees; and

  iv.    Costs.

B.    Pursuant to Plaintiff's Second Cause of Action for Unjust Enrichment:

  i.    Damages, in an amount to be determined at trial, but exceeding $718,530.46;

  ii.    Statutory interest;

  iii.    Attorneys' fees; and

  iv.    Costs.

C.    Pursuant to Plaintiff's Third Cause of Action for Breach of the Duty of

Good Faith and Fair Dealing:

      i.    Damages, in an amount to be determined at trial, but exceeding

        $718,530.46, exclusive of interest, attorneys' fees and costs;

     ii.    Interest as set forth in IC's invoices, which continues to accrue;

    iii.    Attorneys' fees;

    iv.    Costs; and

     v.    Any and all penalties allowed by law.

D.    Any and all additional remedies provided for by law.

E.    For such other and further relief as the Court deems just and equitable

under the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal

Rules of Civil Procedure.

DATED this 9th day of February, 2023.

SUMSION STEELE & CRANDALL

/s/ Daniel L. Steele
Daniel L. Steele

Plaintiffs' Address:

c/o Sumsion Steele & Crandall
765 N. Main Street
Spanish Fork, UT 84660